**PAULEY PETROLEUM, INC., Pauley Pan American Petroleum Company, and American Independent Oil Company de Mexico, S.A. de C.V., Plaintiffs,**

v.

**CONTINENTAL OIL COMPANY, Defendant.**

Court of Chancery of Delaware.

New Castle.

June 23, 1967.

H. Albert Young, H. James Conaway, Jr., and Ben T. Castle, of Young, Conaway, Stargatt & Taylor, Wilmington, for plaintiffs.

James M. Tunnell, Jr., and Andrew B. Kirkpatrick, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant.

DUFFY, Chancellor:

In this case Pauley Petroleum Inc., a Delaware corporation, Pauley Pan American Petroleum Company, a Delaware corporation, and American Independent Oil Company de Mexico, S.A. de C.V., a corporation of the Republic of Mexico (collectively referred to as "Pauley") seek an injunction restraining Continental Oil Company, a Delaware corporation ("Continental"), its agents and others associated with it, from prosecuting two civil lawsuits now pending in Mexico. A temporary restraining order was issued and this is the decision on the application for a preliminary injunction after extensive discovery and argument by the parties.

I

On January 31, 1967 Pauley filed suit in the Delaware Superior Court against Continental and Mexofina, S.A. de C.V., a Mexican corporation ("Mexofina"). Except for qualifying shares, Mexofina is entirely owned by Continental. Personal service was obtained upon Continental and jurisdiction over Mexofina was sought through a writ of foreign attachment (directed to Continental as a garnishee). After the temporary restraining order was issued by this Court, and after argument on the application for a preliminary injunction, the Superior Court announced a decision quashing the writ of foreign attachment.

Pauley's action at law is based on one or more contracts by which Continental, directly or through a subsidiary, acquired oil interests in Mexico from Pauley. Prior thereto, Pauley "owned" Mexofina and all of its stock was transferred to Continental as part of the sale. Specifically, Pauley seeks a judgment of more than $619,000 upon a guaranty contract in which Continental made certain promises with respect to the performance by Mexofina of its obligations under one or more of the other contracts in the series.

On March 6, 1967, Mexofina filed two civil suits (sometimes hereafter referred to in the singular) in Mexico, one against Pauley Pan American Petroleum Company ("Pauley Pan Am"), the other against American Independent Oil Company de Mexico, S.A. de C.V. ("Aminoil"); both of those companies are plaintiffs here. Pauley contends that the claims in the Delaware and Mexican lawsuits are substantially identical and both concern the contracts under which Pauley's interests were sold to Continental. On the other hand, Continental denies that the issues are the same in the Mexican and Delaware Courts.

Speaking broadly, the dispute between the "Pauley people" on the one side and the "Continental people" on the other side centers around their respective rights and duties under Paragraph 5(d) of a Purchase Agreement of May 1, 1962, one of the contracts in the series. That paragraph deals with the so-called "Carried Period" during which Mexofina has exclusive authority to determine the amount and nature of certain expenses to be incurred and the investments to be made in connection with exploration, drilling and development.

After the suits were begun in Mexico, Pauley filed this action and, in view of the limited time available to it under Mexican procedure, and to preserve the status of affairs, this Court issued the temporary order to which I have referred. Thus Pauley's action is here not for adjudication of the merits of the controversy between sides, but for the purpose of establishing an order of precedence in the two other Courts where the sides are litigating. This arises as a result of the Delaware dichotomy which divides jurisdiction at the general trial level into law (Superior) and equity (Chancery) Courts.

## II

Pauley contends that Continental dominates and controls Mexofina, its wholly-owned (for present purposes) subsidiary and uses it as a mere instrumentality for the doing of business in Mexico under the oil contracts. Pauley argues that such domination and control of Mexofina generally and, more specifically Continental's management of the dispute between the parties, make it appropriate for this Court to enjoin it from prosecution of the Mexican suit.

In support of these arguments, Pauley relies on Equitable Trust Company v. Gallagher, 34 Del.Ch. 76, 99 A.2d 490 (1953), and Martin v. D. B. Martin Co., 10 Del.Ch. 211, 88 A. 612 (1896), and refers to many holdings in other jurisdictions in which Courts have "overlooked corporate formalities" under a variety of circumstances. 1 Fletcher Cyclopedia of Corporations (Perm. Ed.) § 41.

### A.

The circumstances under which a Delaware Court will disregard the corporate entity have been, generally if not precisely, laid down in a number of our decisions. In Buechner v. Farbenfabriken Bayer Aktiengesellschaft, 38 Del.Ch. 490, 154 A.2d 684 (1959), for example, the Supreme Court said that "the corporate fiction may be disregarded to prevent fraud, and a wholly-owned subsidiary may sometimes be treated as an instrumentality of the parent." And, more recently, this Court said in Stauffer v. Standard Brands Incorporated, 40 Del. Ch. 202, 178 A.2d 311 (1962); aff'd 187 A. 2d 78 (1962), "In the absence of fraud, the separate entity of a corporation is to be

recognized. This principle has been enunciated by all of the courts of this state."

Fraud does not necessarily exhaust the field as is indicated by the quoted language from *Buechner*. Use of a related or controlled corporation to evade a judicial decree, as Pauley argues, is another circumstance in which the form of the matter has been disregarded by the court. Babee-Tenda Corp. v. Scharco Manufacturing Co., D.C., 156 F.Supp. 582 (1957). But the short of it is that neither fraud nor evasion of a judicial decree nor like conduct is here involved. This leaves for consideration as to "general" domination the "instrumentality" test. And a look at Pauley's cases is of first importance.

As to *Gallagher*, that case, as I read it, turned upon defendant's conduct in making *no* distinction between himself and the corporation. Indeed he so testified. The result that the Court reached, obviously, was necessary to do justice in the dispute and prevent a serious inequity which would otherwise follow.

In *Martin* the Court reviewed many of the general principles applicable to a corporation as a distinct legal entity and the circumstances under which that entity will be disregarded. It is difficult to identify with certainty the fundamental reason which persuaded the Court to finally decide as it did, but I note the many references to fraud and also to an "indirect consolidation" of the companies. I view *Martin* as a case in which the Court was influenced by a desire to prevent fraud which it apparently regarded as a possibility arising out of the close identity of interests of the corporations and the way in which they were operated. On the facts before it, the Court found "agency" or "instrumentality" in the corporate relationships, but the suspicion of fraud seems to have guideposted the finding.

Circumstances determine when, in the cautionary words of *Buechner*, the Court will "sometimes" treat a wholly-owned subsidiary as an instrumentality of the parent. Here, extended discussion is not necessary to show that on this record Mexofina is not the mere instrumentality (in a legal sense) of Continental. It is undisputed, for example, that it is an organized, existing and active corporation which holds oil development contracts with the appropriate Mexican governmental agency (Pemex) and it is an actual operator under some or all of those contracts. Mexofina has its own directors, officers and records. It has some $30 million in invested capital with separate liabilities and bank accounts. At various times it has had up to 550 of its own employees and never fewer than about 86. And it has its own independent auditing agents.

There are some officers and personnel in common between Continental and Mexofina, and there are other areas in which the two corporations are closely identified; but when all of this is said and done, the conclusion forcefully follows that, measured by all of the criteria reasonably applicable under our law, Mexofina is not the mere instrumentality of Continental. In brief, this case on its record facts is not governed by Gallagher or Martin.[1] Compare Owl Fumigating Corporation v. California Cyanide Co., 24 F.2d 718 (D.C.1928), affirmed 30 F.2d 812 (3 Cir. 1929).

**B.**

Pauley's contention as to domination and control of Mexofina by Continental is also refined, as I understand it, to the proposition that the "only strictly relevant domination and control issues are those that concern the dispute between these parties." The main thrust of this argument is that Continental has complete charge of the dispute with Pauley and, by this test, Mexo-

1. Nor is it governed by Chicago, M. & St. P. Ry. Co., et al. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229 (1918), in which the subsidiary by contract had surrendered "substantially all freedom of corporate action" to its two corporate stockholders.

fina is completely subject to Continental's domination and control.

█ I assume for present purposes that Mexofina is responsive to Continental's wishes and/or discipline in the way and for the purpose for which Pauley argues. And yet I conclude that injunctive relief based upon this contention must be denied.

We begin with the fact already established that Mexofina is an organized and operating corporation and it is not in Delaware. It is in Mexico. The only way this Court can reach it, as Pauley argues, is to order Continental, which is here, to apply its stock control for that purpose. If the Court were to adopt that rationale, it would have to disregard the Continental corporate complex and it would do so not for reasons of fraud nor the abandonment by Continental of the corporate structure. It would do so solely upon the premise that this Court has jurisdiction over the situs of power over Mexofina's affairs. In short, the Court would be saying that jurisdiction over the entity which has ultimate control of one side of the dispute between the parties is a sufficient basis for acting. In my judgment that is not a basis under our law for the exercise by this Court of the jurisdiction which it has over Continental, and I know of no authority for such a proposition.

█ Pauley contends that a corporate entity is not sacrosanct for all purposes, and the cases to which I have already referred so indicate. But we must deal here not from an ad hoc notion as to the most reasonable way to compel a Delaware corporation to submit a dispute to a judicial forum. Certainly in the normal course of events a corporate entity must be regarded as more than a mere formality. It is an entity distinct from its stockholders even if its stock is wholly owned by one corporation. Buechner v. Farbenfabriken Bayer Aktiengesellschaft, supra; Bird v. Wilmington Society of Fine Arts, 28 Del.Ch. 449, 43 A.2d 476 (1945). And this is true here, where Mexofina has a purpose and function peculiar to it and which it fulfills. And the record indicates that Continental has respected the formalities necessary for application of the rule followed in the normal course of events. On this point, I do not regard as significant in determining the legal relationship, the sometime use of personal pronouns or other "loose" references by Continental personnel in reference to Mexofina or the Mexican interest in correspondence and depositions. Under these circumstances, it is my view that the law must and does respect the separateness of the corporate entity without reference to the stockholder or the situs of ultimate power over its affairs.

█ In a given case this Court has the power to enjoin a party subject to its jurisdiction from prosecuting a suit in another state. Connecticut M. L. I. Co. v. Merritt-Chapman & Scott Corp., 19 Del.Ch. 103, 163 A. 646 (1932). This includes a case in which prosecution is through a wholly-owned subsidiary. And Continental does not argue to the contrary. But the Court should not exercise that power when it is sought to be invoked solely upon the premise that ultimate control as to a dispute between the parties rests in a corporation (through stock control) which is in and which is subject to the jurisdiction of this Court.

Pauley's argument for a preliminary injunction to the extent that it is based upon Continental's domination and control over Mexofina as to issues which are in dispute between the parties is not persuasive.

### III

I turn now to Pauley's contention that it is appropriate to enjoin Continental from prosecution of the suits begun in Mexico in Mexofina's name. Pauley's argument is to the effect that the Mexican suit was brought for vexing, harassing or oppressing purposes and that the Court should not permit Continental to remove judicial determination of the controversy from Dela-

ware to Mexico. Pauley contends that Continental is trying to accomplish that by the device of a suit instituted in Mexico after the Superior Court suit was filed.

■ In support of this contention Pauley recognizes, as I understand its argument, that it must show "that the nonresident can probably be brought before the Delaware Court by writ of foreign attachment or sequestration." That is fundamental to any such relief. In Peyton v. William C. Peyton Corp., 21 Del.Ch. 299, 187 A. 849 (1936), Chancellor Wolcott said:

> "It is true that where a court of equity has jurisdiction of the parties and the subject matter of a suit, it will prevent the defendant from removing the controversy to another jurisdiction through the device of a suit later instituted in such other jurisdiction."

■ But this rule presupposes jurisdiction of the parties and in view of the announced decision of the Superior Court quashing the writ of foreign attachment, I cannot find that it has jurisdiction over Mexofina. Mexofina is a party to the 1962 Purchase Agreement (it is the only party to that contract on the Continental "side") in which the disputed Paragraph 5(d) ("Carried Period") appears. For this reason the rule announced in *Peyton* is not applicable.[2]

### IV

Pauley argues that it will sustain irreparable injury if Continental is not enjoined from further prosecution of the Mexican actions. On this point, Pauley contends that Delaware law governs the controversy and our courts should pass upon it, that the contractual documents were prepared in English and should be construed in that language, and that critical witnesses and the adverse party in interest (Continental) will not be available in Mexico.

To get at these arguments, it is necessary to briefly identify the contract documents. These are four in number:

(1) *1961 Agreement*: Agreement of March 10, 1961 between Pauley Pan American Petroleum Company, a Delaware corporation ("Pan American"), Continental Oil Company, a Delaware corporation ("Continental"), Mexofina S.A. de C.V., a Mexican corporation ("Mexofina"), Pauley Petroleum Inc., a Delaware corporation, ("Pauley"), American Independent Oil Company de Mexico, S.A. de C.V., a Mexican corporation ("Aminoil"), and individual buyers and sellers;

(2) *1962 Purchase Agreement*: Agreement of May 1, 1962 between Pan American, Aminoil, and Mexofina;

(3) *1962 Supplemental Agreement*: Agreement of May 1, 1962 between Pan American, Aminoil, Pauley, Mexofina, and Continental;

(4) *Guaranty Agreement*: Agreement of May 15, 1962 between Pauley and Continental.

As I have previously stated, the dispute between the parties is centered around the "Carried Period" which is in Paragraph 5(d) of the 1962 Purchase Agreement and they differ as to the choice of law which is applicable to it. The affidavits and depositions show that this was a matter of some discussion during negotiations and that they differ as to why the question was not specifically covered in the agreement. More important, they differ as to the implications to be drawn from the omission and the construction which the Court should place

2. After argument I was advised by counsel for Continental that on April 26, 1967 two new foreign attachment suits were filed in the Delaware Superior Court, both by Pauley Pan Am and Aminoil, and both are against Mexofina. The relationship of those suits to this action has not been briefed and argued by counsel. Hence I do not consider that there is before me the issue of "probable" jurisdiction over Mexofina in those suits.

upon the documents and all of the related events. Pauley's brief recognizes that there is "confusion" surrounding the place of making of the 1962 Purchase Agreement, and I add that it extends to more than that.

Preliminarily, I make three observations about Pauley's argument on irreparable injury.

First, any injunctive relief against Mexofina would have to be executed through Continental. I therefore consider Pauley's argument as (a) an additional consideration to its contention that this Court should exercise its jurisdiction over Continental, which has control of Mexofina, and (b) an appeal to equity to prevent Continental from using its subsidiary to get an unfair advantage by removing the controversy to a foreign jurisdiction.

Second, the court or courts which must ultimately pass upon the merits of the controversy will undoubtedly be faced with a choice of law question. This is a pivotal issue, but I review it only for purposes related to whether or not a preliminary injunction should be granted requiring Continental to cause Mexofina to discontinue prosecution of its suit.

■ Third, on the pending application, this court is bound to "balance the conveniences" of the respective parties and look to the probability of prevailing here which Pauley has shown. Bayard v. Martin, 34 Del.Ch. 184, 101 A.2d 329 (1953).

### A.

The 1962 Purchase Agreement runs to some 53 pages. In form, at least, it is a complete agreement. Continental is not a party to it, Mexofina is. Pan American is identified as a Delaware corporation, but it is specifically noted that it is qualified to do business in Mexico. The petroleum resources of the tidelands involved are all in Mexico and are to be developed under agreements with Pemex (a de-centralized Public Institution of the Government of Mexico). Mexofina is the operator under the agreement, and its duties are specified in detail. The closing under the agreement was to be held in Mexico. Mexofina was to make payment to the Pan American group at the time of closing (and presumably in Mexico).

There is no choice of law provision in the agreement, but there is in the 1961 Agreement, and that reads as follows:

"This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware."

Pauley contends that the 1961 and 1962 agreements must be read together and points to Paragraph 7 of the 1962 Supplemental Agreement as a significant reason for doing this. That paragraph reads as follows:

"Accordingly the 1961 Agreement and 1962 Agreement shall be controlling by and between the parties and the sole basis of any interpretation of their rights, privileges and obligations."

■ When an executed contract refers to another instrument and makes the conditions of the other instrument a part of it, the two will be interpreted together as the agreement of the parties. State ex rel. Hirst v. Black, 7 Terry 295, 83 A.2d 678, 679 (1951). But I am not satisfied that the Purchase Agreement or the Supplemental Agreement (or the surrounding circumstances) establish with specificity incorporation of the Delaware law provision of the 1961 Agreement into the 1962 Purchase Agreement. I say this for several reasons:

(1) The record shows a substantial factual dispute as to why a choice of law provision was omitted from the 1962 Purchase Agreement.

(2) The 1962 Purchase Agreement is complete and detailed on its face.

(3) Certain provisions of the 1961 Agreement had been fully executed by the

time the 1962 Purchase Agreement was signed. Other provisions in the earlier agreement were specifically supplemented by the later document.

(4) The 1962 Purchase Agreement added to the *interest* in certain areas and rights, and so added *other* areas; it did not merely extend the 1961 Agreement per se nor add to its details. Thus, in the 1962 Supplemental Agreement it is said:

"1. The provisions of the 1961 Agreement establishing certain *interests* in Mexofina with respect to the *Tidelands* Contract are *supplemented* by 1962 Agreement establishing *interests* in Mexofina with respect to the *Upland* contract, the *Northeast Mexico* contract, etc. * * *" (Emphasis added.)

(5) The language in Paragraph 7 of the Supplemental Agreement is general as to *both* agreements and does not show an intent to incorporate the details of the earlier agreement in the later one.

 For these reasons I regard the question as coming within the exception noted in State v. Black, supra, where the Court said:

" * * * one of the well settled exceptions to this rule [of incorporation] is this: * * * that an agreement will not be deemed to incorporate matter in some other instrument or writing except to the extent that the same is specifically set forth or identified by reference."

### B.

I recognize that there is merit to Pauley's argument that it may be at some disadvantage in litigating in Mexico, and I recognize that such disadvantage includes difficulties which may arise in the translation of the basic documents (a matter as to which the respective experts of the parties are in dispute). These and the other disadvantages to which Pauley points must be weighed against the fact that all of the parties to the 1962 Purchase Agreement are in Mexico, that Agreement was to be performed there and the closing was held there.

 It is also a reasonable inference that the Purchase Agreement was made in Mexico and, under Delaware law, the construction and validity of a contract is governed by the law of the place where it is made. Harris v. New York Life Ins. Co., 27 Del.Ch. 170, 33 A.2d 154 (1943). That one "attest" signature (to the execution by W. R. Pagen for Pan-American) may have been added outside Mexico is not of such significance as to change that inference, in light of the fact that the parties agreed to close in Mexico City, the agreement so provides, the parties went there for that purpose, and the three executing signatures were affixed there.

On this record I cannot say that Continental either agreed not to litigate in Mexico or that the facts compel that result. Hence the Court by use of the injunctive power cannot extricate Pauley from whatever disadvantage flows from the documents which it signed and from prosecution of the Mexican litigation.

Finally, if this Court were to issue a preliminary injunction, the result would be to preclude a Mexican corporation from prosecuting a lawsuit which is in the courts of that Country against defendants, all of whom are in Mexico, and under an agreement the significant features of which relate entirely to Mexico. I cannot say that a Mexican court would not do justice in the matter and would not find some reasonable way to meet whatever difficulties arise from translation of the documents into Spanish and the other related problems which Pauley here alleges.

* * *

Other arguments made by the parties have been considered, although they may not be specifically discussed herein.

The temporary restraining order heretofore issued will be dissolved and the motion for a preliminary injunction will be denied.